Filed 5/9/16  P. v. Battey CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B266183 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. TA 131157) |
| ANTHONY LEE BATTEY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court for the County of Los Angeles. Pat Connolly, Judge.  Affirmed.

G. Martin Velez, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

_____

On June 5, 2015, a jury convicted defendant Anthony Lee Battey of assault with a deadly weapon in violation of Penal Code section 245, subdivision (a)(1), a felony. The jury found true an allegation that defendant personally inflicted great bodily injury in the commission of the assault. In a separate proceeding, the trial court found four prior convictions to be true (three of them serious or violent felonies under the "Three Strikes" law). The court struck two of defendant's prior strike offenses, and sentenced defendant to 27 years in state prison.

The facts were these. On December 6, 2013, Krystyna Curtis, who was homeless at the time, was sitting with a group of homeless friends in an area in Torrance, near a church, a pharmacy and a liquor store. They were "just having a sip of a little bit of alcohol, just sitting around, just talking." Defendant, who was unknown to the group, approached them, seeming "quite agitated." Ms. Curtis thought he was "another 5150 [referring to someone who has been in a psychiatric ward] being released," because he was dressed in blue pajamas, a leather jacket and a cap. They invited him to join them. Defendant asked "if there was somebody that could make a run to the liquor store that he could trust with money," and the group pointed to Ms. Curtis.

Defendant told Ms. Curtis he wanted a 40-ouncer of beer, some vodka, and a pack of Camel cigarettes, and gave Ms. Curtis "pretty much the right amount of money, like $15." Ms. Curtis went to the liquor store and brought the purchases back to defendant. (Ms. Curtis identified photographs of these items at trial.)

Defendant "was very kind," and offered the vodka to everyone, except for a woman named Rhonda. "[H]e was pretty adamant about not letting her have a sip." The situation "was uncomfortable"; "[t]here was tension between Rhonda and [defendant] and the others, because, you know, we all share together. And [defendant] seemed upset."

Defendant "was talking about wanting to make a phone call," so, because of the tension, Ms. Curtis thought she would "take him out of the immediate spot where we were . . . ." She walked him to a phone booth across the street from the liquor store. Then defendant pulled out a cell phone, and "was mumbling a bunch of stuff" that she

could not understand, except that he seemed to want to call his daughter. Ms. Curtis left defendant there, near the pay phone, and went back to sit with her friends.

Ms. Curtis did not see defendant again until "a couple hours later." Defendant was "coming down the street holding his cane up," like a baseball bat. "And he come down, and he was yelling something, I couldn't make heads or tails out of it. But he clocked Cory, who was sitting with his hoodie down and with his head on his knees. He clocked Cory and then started to go towards Rhonda." Ms. Curtis "stood up to protect her, and then I got clocked." Ms. Curtis was "protecting Rhonda, because he was going after [her]." Defendant hit Ms. Curtis twice in the head with a heavy wooden cane, and "then it was pretty much lights out for me." (The cane, broken into three pieces, was placed in evidence at the trial.) Ms. Curtis remembered Rhonda "screaming about a lot of blood, and Cory putting something underneath my neck."

Ms. Curtis remembered little else until she was in the hospital, where she told the police officer "that it was an African American in his late 50's, wearing blue monkey pajamas, and a leather jacket, and a cap."

Dan De Meyer, a fire captain for the Los Angeles County Fire Department, was on duty and treated Ms. Curtis at the scene. She "had bruising and really was unable to speak with us at the time, she was laying on the sidewalk." Captain De Meyer's crew immobilized Ms. Curtis's head and neck, placing her on a backboard to keep the spinal column as straight as possible, a typical aid for head injuries. (At trial, Captain De Meyer identified photographs of Ms. Curtis and the injuries to her head. These were injuries "[i]n her head region, the frontal lobe," with blood and with "some swelling over the right orbit and right eye area.")

When Deputy Sheriff Bao Dang arrived, he found Ms. Curtis "[v]ery distraught. She was in pain. She was bleeding. She was out of it." She was loaded into an ambulance, and Deputy Dang went to the hospital to speak with her. Ms. Curtis told him that "while she was hanging out at that location, a male black walked up to her and struck her over the head with a wooden cane." Deputy Dang found the three pieces of the wooden cane on the sidewalk and booked it into evidence. In addition to the cane,

3

Deputy Dang recovered a black plastic bag with a bottle of vodka, a pack of cigarettes, and a 40 ouncer of Old English beer at the scene.

Deputy Dang, along with two other deputies, located defendant, who had a laceration on the top of his head and blood on his face, about a half mile or less from the scene. Another deputy advised defendant of his *Miranda*[1] rights, and defendant said he understood them. He waived his rights and agreed to speak with the deputies. Deputy Dang asked defendant "if he got into a fight." Defendant answered, " 'Yeah. I was in the wrong. I hit her with the cane.' " Deputy Dang asked him how he sustained the injury to his head, "if he got it before or after the fight," and "[h]e said after." (At the trial, Deputy Dang's police report refreshed his recollection that Ms. Curtis told him at the scene that defendant "had blood on his face.")

Defendant was arrested and charged by information with assault with a deadly weapon. The information alleged defendant personally inflicted great bodily injury in the commission of the assault, and also alleged three prior serious or violent felony convictions, as well as a prison prior.

The record shows that defendant's counsel declared a doubt as to defendant's mental competence on March 18, 2014, and the court appointed an expert to examine defendant and report to the court. Criminal proceedings were reinstated on July 17, 2014. On October 22, 2014, a *Pitchess*[2] hearing was held and materials were ordered to be disclosed. On December 9, 2014, defense counsel again declared a doubt as to defendant's mental competence, and an expert was appointed to examine defendant. On February 25, 2015, the trial court found defendant mentally competent to stand trial, and proceedings were resumed.

At trial in June 2015, the facts described above were presented to the jury. The evidence also showed that when Ms. Curtis testified, she was in custody on a felony conviction.

---

[1]     *Miranda v. Arizona* (1966) 384 U.S. 436.

[2]     *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

In addition, the prosecution and defense stipulated that Dr. Kenechukwu Ojukwu, a licensed physician at Los Angeles County Harbor UCLA Medical Center, would have testified as follows: On December 6, 2013, Ms. Curtis was treated and diagnosed with an abrasion on the forehead, blunt head trauma, an orbital fracture, and a zygomatic arch fracture. Further, Dr. Ojukwu determined that Ms. Curtis "had previously suffered from a history of blindness of her right eye." (Ms. Curtis testified that there had been nothing wrong with her eye before defendant "fractured my cheek and blinded me in my right eye.")

The defense presented testimony from Detective Dion Ingram. He was assigned as an investigator in the case, and he tried to speak with defendant the day after the assault, while defendant was inside a booking cell at the Carson police station. Defendant "seemed upset," and was not able to speak coherently with Detective Ingram that day. Defendant did not testify at trial.

After the jury retired to deliberate, the trial court advised defendant of his right to have the jury decide the truth of his prior convictions; that evidence would be presented just as had been done in the trial; and defendant would have the right to present evidence and to remain silent. Defendant waived his right to a jury trial on the prior convictions.

The jury found defendant guilty and found the great bodily injury enhancement to be true.

A court trial on defendant's prior convictions occurred on July 22, 2015. The prosecutor presented evidence of defendant's three prior serious or violent felony convictions (in 1974, case No. A309084; in 1980, case No. A355929; and in 1997, case No. YA032550), and evidence of his 2013 prison prior (case No. TA125856). The court found all the prior convictions to be true, and then dismissed two of the three strike priors.

After hearing argument, the court stated: "[Defendant] has been . . . institutionalized since the time he was a juvenile. And the crimes for which he's been institutionalized, some of which are very grave. [¶] The sex crime as a juvenile, robbery, which is a crime of violence, as well as the residential burglary. [¶] But the court also is

5

taking into consideration the various things that [defense counsel] has pointed out, not only that there are some type of mental issues that [defendant] has – and I think that that's also clear. . . . And also the court does feel that even though three strikes is something that, perhaps, another court would think appropriate, is not really what is envisioned in a crime such as this, even though there was a GBI finding, and this was an assault with a cane, great enough that [defendant] broke that cane into three different pieces during that attack. And it was an unprovoked attack."

The court sentenced defendant to 27 years in state prison, calculated as follows: the upper term of four years, doubled for the latest strike prior, plus three 5-year terms for the strike priors, plus three years for the great bodily injury enhancement, plus one year for a prison prior). The court observed it had taken into consideration defendant's age when imposing the 27-year sentence.

The court stated defendant was eligible for 15 percent credits, and ordered 593 days of actual custody credit and 89 days of conduct credit, for a total of 682 days. The court imposed a $1,000 restitution fine, a $1,000 parole revocation fine (stayed), a $40 court operations fee, and a $30 criminal conviction assessment fee, and ordered submission of a DNA sample. The court also set a restitution hearing, for which defendant waived his appearance.

Defendant filed a timely appeal.

Defendant's appointed counsel filed a *Wende* brief (*People v. Wende* (1979) 25 Cal.3d 436 (*Wende*)) requesting our independent review of the record. A declaration from counsel states that counsel advised defendant of the nature of the *Wende* brief and of his right to file a supplemental brief within 30 days; that counsel advised defendant he would send him, upon defendant's request, the client's copy of the record on appeal, to aid defendant's preparation of a supplemental brief; and that counsel would remain available to brief issues as requested by the court and would retain the record on appeal for that purpose. No supplemental brief has been filed.

We have reviewed the record on appeal. We are satisfied that defendant's appointed counsel has fully complied with counsel's responsibilities and that no arguable

6

issues exist.  (*People v. Kelly* (2006) 40 Cal.4th 106, 109-110; *Wende, supra,* 25 Cal.3d at p. 441.)

## DISPOSITION

The judgment is affirmed.

GRIMES, J.

WE CONCUR:

BIGELOW, P. J.

RUBIN, J.